Filed 5/22/13  P. v. Porter CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ANTHONY PORTER,<br><br>      Defendant and Appellant. | H037619<br>(Monterey County<br> Super. Ct. No. SS042332) |

A jury convicted defendant Anthony Porter of a number of crimes and found true a number of sentence-enhancement allegations following his participation in a drive-by shooting at individuals who were sitting on a porch.  The crimes included two counts of attempted murder.  The trial court sentenced him to 25 years in state prison, but in so doing, it granted a new trial on two allegations:  (1) that the crimes were committed for the benefit of a criminal street gang; and (2) that the attempted murders were committed willfully, deliberately and with premeditation.  A true finding on these allegations could have resulted in a life sentence with an 85-year minimum term.

Defendant initially contended that he could not be retried on these allegations, but the California Supreme Court held otherwise, directing this court to deny defendant's petition for writ of mandate.  (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 130, 138, 140).  Faced with retrial on these allegations, defendant agreed to a settlement under which he will serve a total of 34 years in prison, nine years longer than his original

sentence. In exchange, the People agreed to dismiss the remaining two allegations. Defendant also agreed "not to ask the court to withdraw my acceptance of this agreement at any time after it is entered [into]." In addition, he agreed not to appeal from the judgment or seek habeas corpus relief, but he did not waive any claims he could bring relating to ineffective assistance of counsel.

Despite defendant's agreement not to withdraw his acceptance of the settlement at any time after it was entered, he tried to withdraw from it after learning the results of gunshot residue retesting that he had ordered. The trial court denied defendant's request to withdraw from the agreement. Defendant appeals from the judgment, and, in a separate filing pending before this court, *In re Anthony Porter on Habeas Corpus*, No. H039221, is petitioning for a writ of habeas corpus.

Because defendant waived his right to appeal the judgment, we will dismiss his appeal. And by an order filed today, we have also denied his habeas corpus petition.

FACTS AND PROCEDURAL BACKGROUND

On March 20, 2004, Albert Johnson was shot and killed in a drive-by shooting in Seaside, California. Johnson was a member of K.A.P., a Seaside street gang. On that same day, DeShawn Lee, an associate of a rival gang named Seaside Crips, was arrested and taken into custody on suspicion of driving the car from which Johnson was shot. Lee's family of six adults and three children lived at 1246 Sonoma Street in Seaside.

On March 26, 2004, the day of Johnson's funeral, defendant and another man participated in a drive-by shooting at Lee's house at 1246 Sonoma Street. Additional details may be found in *People v. Porter*, No. H029031 (nonpub. opn.) (*Porter I*), but they are irrelevant to this appeal.

As we described in defendant's first appeal, *Porter I*, *supra*, No. H029031, the jury convicted defendant of two counts of attempted willful, deliberate, and premeditated

2

murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a))[1], shooting at an inhabited dwelling (§ 246), two counts of assault with a semiautomatic firearm (§ 245, subd. (b)), carrying a loaded and concealable firearm registered to a different owner (former § 12031, subd. (a)(2)(F); Stats. 1999, ch. 571, § 3, p. 3964), and shooting from a motor vehicle (former § 12034, subd. (c); Stats. 1987, ch. 1147, § 3, p. 4059). The jury found true a gang-based sentencing enhancement allegation (§ 186.22, subd. (b)(1)) with regard to each charged offense, a sentencing enhancement allegation for personally and intentionally discharging a firearm (§ 12022.53, subd. (c)) with regard to the attempted murder counts, and a sentencing enhancement allegation for personal use of a firearm (§ 12022.5, subd. (a)) on the two assault-with-a-semiautomatic-firearm counts.

The trial court disposed of *Porter I*, *supra*, No. H029031, by granting a new trial on the gang-enhancement allegations and the allegations that the attempted murders were willful, deliberate, and premeditated. It ruled that the prosecution could request a date for a new trial on those allegations. (*Porter v. Superior Court*, *supra*, 47 Cal.4th at pp. 130-131.) On the convictions and allegation findings that it upheld, it sentenced defendant to a determinate term of 25 years in prison. (*Id*. at p. 131.) It reached this figure by imposing concurrent 25-year terms—a five-year term on each attempted murder conviction and a 20-year consecutive term on each section 12022.53, subdivision (c), finding.

After the California Supreme Court determined in *Porter v. Superior Court*, *supra*, 47 Cal.4th 125, that defendant could be retried on the two outstanding allegations, proceedings resumed in superior court. Counsel for defendant advised the court, "defendant consents to reopen sentencing . . . as stated in the agreement . . . ."

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

3

The agreement to which counsel referred was a "waiver of rights regarding stipulation to resentencing to consecutive sentence and any state or federal writs and appeals." (Font attribute changed to lower case.) It was signed by defendant, defense counsel, and the prosecutor, and it was filed with the court. Under it, defendant accepted a 34-year sentence in exchange for the People's dismissal of the remaining two allegations that could have been retried. To arrive at the 34-year term, defendant was resentenced as follows: on the second attempted murder count he received a consecutive term of imprisonment of one-third of the middle term of seven years, i.e., two years and four months; and on the section 12022.53, subdivision (c), enhancement allegation he received a consecutive term of imprisonment of one-third the middle term of 20 years, i.e., six years and eight months. All other counts would run concurrently.

As part of the settlement, defendant memorialized that "I agree to give up all rights regarding both state and federal writs and appeals. This includes, but is not limited to, the right to appeal my conviction, the judgment, and any other orders previously issued by this court. I specifically agree to waive any right to appeal the sentence negotiated in these cases. I agree not to file any collateral attacks on my convictions or sentence at any time in the future. [¶] I agree not to ask the court to withdraw my acceptance of this agreement at any time after it is entered."

Defense counsel explained to the trial court at a hearing that defendant was agreeing to the settlement because he faced life in prison if a trier of fact returned true findings on the section 186.22, subdivision (b), gang-benefit enhancement allegations with respect to the section 246 conviction. He faced the same term if a trier of fact found his two attempted murder convictions to involve premeditated and deliberate murder. In the worst-case scenario, he would have to serve 85 years in prison before being eligible for parole. He preferred the certainty of an additional nine-year determinate term to the risk of such long confinement. Defendant personally stated at the hearing that absent the settlement his term could be, if a new trier of fact found against him on all of the

4

remaining allegations, "156 years. Three consecutive life terms for 156 years." "Life without parole, in other words," defendant added.

At the hearing, defense counsel mentioned that the agreement did not contain a specific ineffective assistance of counsel provision and "obviously we would not able to advise him on that issue." The trial court asked defendant, "Well, you do understand that you're giving up your right to any kind of appeal or writ?" Defendant answered, "Yeah. Yes." The court clarified, "You're waiving your right to seek any kind of relief at a level above this court, which includes appellate courts, supreme courts, federal courts, courts that review writs, and that sort of thing. Do you understand that?" Again defendant replied, "Yes."

The trial court suggested, however, that if counsel "were ineffective in providing you . . . with guidance, legal information, that that could possibly be challenged."

As the hearing continued, defense counsel stated, "I think what we're doing is, by stipulation, agreeing that the 120-day bar to change a sentence is not prohibiting you, under [section 1170, subdivision (d)], from resentencing or modifying the sentence." The trial court responded, "I do think that the Court retains jurisdiction to resentence in a case where there is a subsequent conviction." The court added this caveat: "I don't know if the parties can stipulate to the Court's jurisdiction. I don't know. This may be one of those situations where you can." But the court proceeded, commenting only that "If there is an appeal and this is without jurisdiction, then we're back to square one, I would think."

When the trial court asked defendant if he was exposed to five life-term counts, defendant corrected the court, saying "No, it's three." The court then said, "based on the risk that's involved, . . . you are agreeable to extending your prison commitment, as we've just discussed and as . . . outlined here in this document. Is that all correct?" Defendant replied, "Yes."

5

As the hearing approached its close, defense counsel asked of his client, "Anthony, you understand what the Judge just indicated, that there would—it's a requirement, to implement the agreement that we've reached today, that you agree that the Court may do this at this time?" Defendant replied, "Yes." The court asked, "Do you understand that?" Defendant replied, "I'm agreeing that I be resentenced here today, yes." The court said, "I think it's as clear as it can be."

At a hearing a month later, however, defendant reneged on his commitment not to try to withdraw from the settlement agreement. The trial court was prepared to impose sentence in accordance with the agreement. But the previous evening, a forensic laboratory had informed defense counsel that it had completed court-ordered gunshot residue retesting. Counsel informed the court that the laboratory found residue on lifts taken from the hands of codefendant Travis Williams. (Williams is not a party to this appeal.) In light of this finding, defendant's counsel had asked the laboratory to retest defendant's lifts and, pending the results of that retest, requested a continuance of the sentencing hearing.

The prosecutor objected, saying defendant had already entered into the agreement and waived his rights. The trial court pointed out that this newly discovered evidence could have been brought to light after the resentencing scheduled to be done at the hearing, and asked counsel, "then what?" "Or a year from now or ten years from now," the court added.

Defense counsel argued that, given the gravity of the sentence, it was unfair to leave the issue unresolved. The prosecutor answered, "I know he [defense counsel] didn't try this case. I did. I can tell the Court that a police officer watched Mr. Porter throw the gun out the window after the shooting. Mr. Porter told the police officer that he threw the gun out the window."

"[T]hat gunshot residue has great limitations," the prosecutor continued. "[I]f you're near a gun or handle a gun after shooting, or it's on your clothing in a car where

6

the gunshots are fired, it [offers] very little help telling us who the shooter was. [¶] Mr. Porter, after fleeing the car, . . . slid out underneath a truck in a parking lot, and [was hiding] underneath this truck when police found him. The idea that he might have scuffed off or lost the gunshot residue from himself in that procedure was, according to the expert on it, very likely and, really, his lack of gunshot residue didn't tell us much. [¶] . . . We didn't test everything." "The defendant has told people under oath that he handled the gun, that the codefendant handed him the gun and told him to get rid of it; and it was seen happening. So that's really not much of an issue." "And, frankly, the counts this would be relevant for are not the premeditation [element of defendant's attempted murder convictions] . . . or the gang enhancement[s]"—i.e., the sentencing enhancements for which defendant had agreed to reopening his sentencing. "They're counts that the defendant was found guilty of five, six years ago, has appealed, has writted, and has lost all of those appeals and writs." Finally, the prosecutor argued, "there was [an] eyewitness that watched him fire the gun." "[W]e are six years into this thing," the prosecutor concluded, "and it needs to end."

The trial court decided to continue the case for three weeks, as defense counsel requested.

When court reconvened three weeks later, defendant had moved to withdraw from the settlement agreement. Counsel argued that the pending test results had come back and confirmed that defendant had no gun residue on his person or clothing. He argued that defendant's waiver was not knowing and intelligent because "You can't waive what you don't know."

The trial court replied that it had become common to waive one's statutory right to appeal and the opportunity to seek posttrial writs. "There must be case authority on that issue," the court commented. Defense counsel replied that he had been unable to locate any. "[T]here should be some kind of case authority on that," the court reiterated.

Counsel rejoined that "it's especially troubling because . . . it requires a waiver of any wrongdoing, any late discovery . . . it vitiates the existence of any of these."

The trial court put the matter over again and ordered the parties to submit relevant research for the next hearing date.

Three and a half months later, with defendant's operative motion to withdraw from the settlement agreement pending before the trial court, the court convened the next hearing session. Defense counsel spoke of the "significant exculpatory evidence" that had led to the bringing of the motion. The prosecutor insisted that the settlement must be enforced and that the newly discovered evidence was not exculpatory, because "all we're here on is premeditation and a gang enhancement, and the gunshot residue speaks [to] neither." Defense counsel disagreed, saying, "If he didn't have the gun and he was intoxicated in the car . . . it reflects significantly on the issue of whether he premeditated this, whether he even knew about this . . . ."

The next hearing session took place a month later. At that session, the trial court observed that if defendant were retried on the outstanding sentence enhancement allegations and it chose to impose a longer term, the court would be resentencing defendant anyway and would have jurisdiction to do so—this, we would add, would seem to be mandated by the California Supreme Court's decision in *Porter v. Superior Court*, *supra*, 47 Cal.4th 125. Whether through retrial or by ratifying the settlement agreement, the court said, "the fact of the matter is [that] it is changing the sentence when the sentence becomes longer." For that reason, it said, "I have tentatively gotten past the jurisdictional issue."

Defense counsel acknowledged that this view was supported by case law, although he saw "significant differentiations" in his client's case. The discussion proceeded from there to other matters.

At the next hearing session, conducted about six weeks later, the trial court held a contested hearing on the nature and significance of the newly discovered evidence.

8

Because the substance of the matters disputed at the hearing is not germane to the disposition we will reach, there is no need to summarize that lengthy proceeding here.

Some six weeks later, the trial court held another hearing session, this one to decide defendant's motion to withdraw from the settlement agreement. The court first noted that defendant had agreed not to seek to withdraw from the negotiated disposition. The court stated, "the waiver of such a right, or an opportunity, if it has any meaning at all, means that the defendant cannot withdraw his . . . agreement in the same fashion, to the same extent, or to the same standards as he could have had he not waived." The agreement's provision meant that "even if he can demonstrate good cause by clear and convincing evidence, he will not ask to withdraw from the deal." An exception would exist, however, if "the Prosecution extracted the agreement through some kind of malicious misconduct." But the court found no evidence of it and denied the motion to withdraw.

Continuing with its statement of reasons at the hearing, the trial court ruled that there was no surprise that might be a basis for rescinding the agreement: defendant knew that certain retests for gunshot residue had not been done when he agreed to the 34-year sentence disposition. Also, given the case's complexity and the time the government had invested in prosecuting it, there was an element of detrimental reliance on the agreement, especially because it was entered into on the eve of trial, when the parties had lined up their witnesses and other evidence.

With regard to the substantive issue lying behind defendant's effort, the trial court stated that "the gunshot residue test results . . . [are] de minimis in the context of the evidence that defendant was the shooter." Moreover, the court added, "everyone agrees both the defendant and the driver [Travis Williams] handled the gun."

Indeed, this court noted that defendant handled the gun in our prior opinion: "A handgun was found in the area where another pursuing officer had observed the suspect vehicle slow and the passenger's hand come out of the car and make a throwing motion.

9

The gun's location was consistent with it having been thrown out by the passenger and defendant admitted throwing the gun out of the car." (*Porter I*, *supra*, H029031 [typed opn., p. 5].)

A week later the trial court conducted a final hearing in which it sentenced defendant to 34 years in prison in strict conformity with the settlement agreement and dismissed the sentence enhancement allegations that would have been retried.

In sum, despite defendant's agreement to forgo any future legal proceedings that might benefit him, he later moved to withdraw from the agreement and brings this appeal from the judgment entered after the trial court denied his motion to withdraw from the agreement. He also has presented this court with the petition for writ of habeas corpus previously mentioned, *In re Anthony Porter on Habeas Corpus*, *supra*, No. H039221.

## DISCUSSION

Defendant contended before the trial court that his "plea agreement was entered [into] through mistake and ignorance of facts that were discovered after his submission to the agreement." Also, citing *Williams v. Superior Court* (1939) 14 Cal.2d 656, 662, he contended that "it is beyond the jurisdictional authority of another department of the same court to interfere with the exercise of the power of the department to which the proceeding has been so assigned." (*Id*. at p. 662.) As a result, defendant argued that the court and parties lacked "jurisdiction to enter into an agreement" modifying the sentence previously imposed by another superior court judge. He renews both arguments on appeal.

I.    *Jurisdictional Considerations*

Because defendant waived his right to appeal, a threshold question is whether we have jurisdiction to decide whether we may entertain his appeal. "A court has jurisdiction to determine its own jurisdiction, for a basic issue in any case before a tribunal is its power to act, and it must have authority to decide that question in the first

10

instance." (*Rescue Army v. Municipal Court* (1946) 28 Cal.2d 460, 464.) We proceed to consider the issues before us.

II.     *General Principles*

"A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." (*United States v. Mezzanatto* (1995) 513 U.S. 196, 201.) If a waiver is entered into with a criminal defendant's full comprehension of its scope and consequences—i.e., knowingly, intelligently, and voluntarily—it may be broad and encompass collateral challenges to the judgment as well as direct review. In a similar vein, a defendant may waive otherwise available opportunities to seek a remedy by way of a collateral challenge to the judgment in state or federal court—e.g., through petitions for writ of habeas corpus challenging one's confinement. (See *Comer v. Schriro* (9th Cir. 2007) 480 F.3d 960 (*per curiam*) [defendant validly elected to waive further federal habeas corpus challenges to a death sentence imposed against him under Arizona law because he did not wish to engage in further proceedings].)

In California, there exists, with certain exceptions, a statutory right to appeal from a final judgment of criminal conviction or an appealable superior court order. (§ 1237.) But a defendant may waive that right. "Just as a defendant may affirmatively waive constitutional rights to a jury trial, to confront and cross-examine witnesses, to the privilege against self-incrimination, and to counsel as a consequence of a negotiated plea agreement, so also may a defendant waive the right to appeal as part of the agreement." (*People v. Panizzon* (1996) 13 Cal.4th 68, 80, fn. omitted.)

III.     *Defendant Executed the Waiver Knowingly, Intelligently, and Voluntarily*

Citing a number of cases discussing situations in which reviewing courts addressed motions to withdraw from plea agreements, defendant claims that the trial court abused its discretion under state law in denying his motion to withdraw from the settlement agreement. He argues that the applicable standard is the establishment of

11

"mistake, ignorance, inadvertence or any factor overcoming the exercise of a free judgment" (*People v. Cruz* (1974) 12 Cal.3d 562, 566) and that the trial court in this case meaningfully considered only "surprise" (see *ante*, p. 9) and, erroneously, failed to give meaningful consideration to the other factors listed in *Cruz*.

" 'To be enforceable, a defendant's waiver of the right to appeal must be knowing, intelligent, and voluntary.' " (*People v. Buttram* (2003) 30 Cal.4th 773, 792 [addressing negotiated plea agreements].) To the same effect, under the United States Constitution, when "the seriousness of the matter" (*United States v. Ruiz* (2002) 536 U.S. 622, 629 (*Ruiz*) [speaking of the entry of a guilty plea]) or matters being waived is evident, a criminal defendant who executes a waiver agreement must do so knowingly, intelligently, voluntarily, and with sufficient awareness of the relevant circumstances and likely consequences. Clearly, "forgo[ing] not only a fair trial, but also accompanying constitutional guarantees" (*id*. at pp. 628-629) and agreeing to a sentence nine years longer than the one originally imposed meets that standard of seriousness. California's knowing, intelligent, and voluntary criteria, although not expressly stating the sufficient-awareness component mentioned in *Ruiz*, essentially comprise the same standard. That is, to waive a right or benefit intelligently requires doing so with sufficient awareness of the relevant circumstances and likely consequences.

Defendant's waiver was valid. The agreement itself laboriously and carefully described the rights and opportunities that defendant was waiving and the prospective benefits for which he was waiving them. The benefits included, in addition to eliminating the perceived risk of an 85-year minimum sentence, a promise that defendant would not be required to cooperate with the prosecution in any way, such as—this was stated expressly—by testifying against anyone else in the case. When defendant spoke personally in court regarding the agreement, he did so intelligently and perceptively—he showed acute awareness of the costs and benefits to him of the agreement. Defense

12

counsel assured the court, in writing and by questioning his client in court, that defendant understood what he was doing.

IV.    *The Trial Court Did Not Lack Fundamental Jurisdiction to Resentence Defendant*

Defendant also claims that the trial court lacked fundamental jurisdiction to resentence him in accordance with the agreement and, therefore, he is entitled to withdraw from the agreement, no matter that he waived his right to appeal.  He relies on *People v. Nguyen* (1993) 13 Cal.App.4th 114 (*Nguyen*), which held, in a brief statement, that "[t]he parties should reasonably expect certain issues would not be waived, including acts beyond the court's jurisdiction."  (*Id*. at p. 121.)  And he relies on *People v. Roe* (1983) 148 Cal.App.3d 112 (*Roe*), which in his view requires a conclusion that a court endeavoring to resentence a defendant after the 120-day grace period set forth in section 1170, subdivision (d) has expired lacks fundamental jurisdiction to do so.[2]

References to the term *jurisdiction* have become a capsule referent to a legal concept whose outlines are blurry.  "The term [jurisdiction], used continuously in a variety of situations, has so many different meanings that no single statement can be entirely satisfactory as a definition.  At best it is possible to give the principal illustrations of the situations in which it may be applied, and then to consider whether the present case falls within one of the classifications."  (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 287-288 (*Abelleira*).)

---

[2] Section 1170, subdivision (d) provides in pertinent part: "When a defendant subject to this section or subdivision (b) of Section 1168 has been sentenced to be imprisoned in the state prison and has been committed to the custody of the secretary, the court may, within 120 days of the date of commitment on its own motion, or at any time upon the recommendation of the secretary or the Board of Parole Hearings, recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if he or she had not previously been sentenced, provided the new sentence, if any, is no greater than the initial sentence."

" 'When courts use the phrase "lack of jurisdiction," they are usually referring to one of two different concepts, although, as one court has observed, the distinction between them is "hazy." [Citation.]' [Citation.] A lack of jurisdiction in its fundamental or strict sense results in ' "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (*Abelleira*[, *supra*,] 17 Cal.2d 280, 288.) On the other hand, a court may have jurisdiction in the strict sense but nevertheless lack " 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (*Ibid*.) When a court fails to conduct itself in the manner prescribed, it is said to have acted in *excess* of jurisdiction.' (*Ibid*.; [citation].)" (*People v. Lara* (2010) 48 Cal.4th 216, 224-225 (*Lara*).) As summarized in *Abelleira*, " 'when a statute authorizes prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction . . . .' " (*Id*. at p. 290.)

Conversely, *Abelleira* described certain rare circumstances in which a trial court would lack fundamental jurisdiction—as noted, this means "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (*Abelleira*, *supra*, 17 Cal.2d at p. 288.) "A state court has no jurisdiction to determine title to land located outside its territorial borders, for the subject matter is entirely beyond its authority or power. [Citation.] A court has no jurisdiction to adjudicate upon the marital status of persons when neither is domiciled within the state. [Citations.] A court has no jurisdiction to render a personal judgment against one not personally served with process within its territorial borders . . . . A court has no jurisdiction to hear or determine a case where the type of proceeding or the amount in controversy is beyond the jurisdiction defined for that particular court by statute or constitutional provision. [Citation.] Other examples of lack of jurisdiction in this fundamental sense will readily occur." (*Ibid.*)

14

In other words, fundamental jurisdiction is lacking when a person, entity, or interests associated with a piece of property have no place before the court at all. The distinction between lack of fundamental jurisdiction and acts in excess of jurisdiction "is important because the remedies are different. '[F]undamental jurisdiction cannot be conferred by waiver, estoppel, or consent. Rather, an act beyond a court's jurisdiction in the fundamental sense is null and void' *ab initio*. [Citation.] 'Therefore, a claim based on a lack of . . . fundamental jurisdiction[ ] may be raised for the first time on appeal. [Citation.] "In contrast, an act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time. [Citations.]" [Citations.]' " (*Lara*, *supra*, at p. 225.)

The trial court acted within its authority in this case, neither exceeding its jurisdiction nor acting despite a lack of subject-matter jurisdiction, because issuance of the remittitur following the California Supreme Court's decision in *Porter v. Superior Court*, *supra*, 47 Cal.4th 125, restored jurisdiction in the superior court to try defendant on the sentence enhancement allegations left unresolved following his first trial. " 'The filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and issuance of the remittitur.' " (*Alanis*, *supra*, at p. 1472.) "On receipt of the remittitur from the reviewing court, the jurisdiction of the superior court is restored to it." (*People v. Hall* (1952) 115 Cal.App.2d 144, 148; see, e.g., *People v. Picklesimer* (2010) 48 Cal.4th 330, 337; *People v. Dick* (1870) 39 Cal. 102, 103-104.) If the court had jurisdiction to try defendant and thereafter resentence him, it had jurisdiction to accept a settlement agreement in which he acquiesced to be resentenced by that dispositional method instead.

*Roe*, *supra*, 148 Cal.App.3d 112, is of no help to defendant because the trial court in that case purported to recall and resentence the defendant on its own motion nine months after originally pronouncing sentence, after it had lost jurisdiction to do so under the applicable statute. Here, by contrast, the remittitur that was issued after the California

15

Supreme Court's decision in *Porter v. Superior Court*, *supra*, 47 Cal.4th 125, restored jurisdiction in the trial court to retry defendant on the sentence enhancement allegations. That leaves the brief statement in *Nguyen* that "[t]he parties should reasonably expect certain issues would not be waived, including acts beyond the court's jurisdiction." (*Id.* at p. 121.) But the trial court was vested with jurisdiction to retry defendant on the two remaining allegations after the remittitur issued; therefore, *Nguyen* is also of no help to defendant.

V. *Defendant Did Not Receive Ineffective Assistance of Counsel*

Defendant claims that his counsel was ineffective, in violation of the Sixth Amendment to the United States Constitution, for persuading him to accept the settlement agreement without waiting for the results of the new round of gunshot residue testing. Because the trial court excepted any claim of ineffective assistance of counsel from the scope of the settlement agreement, we must consider defendant's claim on appeal even though arguably the agreement's plain terms would have barred such a claim.

Under the Sixth Amendment, a criminal defendant has the right to the effective assistance of counsel. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) "The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result." (*Ibid.*) A claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.)

" ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citation.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical

16

decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' " (*People v. Stanley* (2006) 39 Cal.4th 913, 954.)

Here, there was no tactical error at all. It was a reasonable tactical decision for counsel to recommend that defendant accept a nine-year increase in his determinate prison sentence and avoid the risk of being convicted of the unsettled charges on retrial and receiving what defendant and defense counsel understood could be three life terms with an 85-year minimum sentence. (Defendant does not argue on appeal that this was a misunderstanding.) As the prosecutor pointed out during the litigation over the enforceability of the settlement agreement, and as defense counsel could reasonably have concluded at the time he endorsed the agreement, even if the new gunshot residue tests returned results favorable to defendant in principle, they would have no bearing on the remaining unsettled matters—i.e., whether the attempted murder was premeditated and deliberate and whether the crimes were committed for the benefit of a criminal street gang. Rather, to the extent they had any significance at all, they impacted charges that were no longer at issue.

Counsel could also reasonably tell his client that he was already guaranteed 25 years in prison, that the settlement agreement would add only nine more years to that term, that at the end of the 34 years (adjusted for any available credits) defendant would be released, and that if defendant did not accede to the agreement, he might spend the rest of his life prison. Until defendant accepted the agreement, there could be no guaranty that the prosecution would keep it open. Defendant and his counsel might have waited for the gunshot residue results only to find out that the prosecution wished to proceed with a retrial on the remaining allegations. "*Strickland* . . . permits counsel to 'make a reasonable decision that makes particular investigations unnecessary.' " (*Harrington v. Richter* (2011) __ U.S. __, __ [131 S.Ct. 770, 778].) On this record, this is what counsel did. There was no deficient performance and, accordingly, no ineffective assistance of

17

counsel.  Furthermore, defendant and defense counsel knew that certain retesting for gunshot residue had not been completed when defendant agreed to the settlement agreement.

We reach this conclusion notwithstanding defense counsel's statement, in the reply document in defendant's motion to withdraw from the settlement agreement, that his client "has a legitimate claim of ineffective assistance of counsel for current defense counsel's failure to advise him not to sign the agreement . . . until we could complete the gunshot residue retest . . . ."  As a general rule, " '[s]elf-proclaimed inadequacies on the part of trial counsel in aid of a client . . . are not persuasive.' "  (*In re Burton* (2006) 40 Cal.4th 205, 223.)  There may be exceptions, of course, depending on the circumstances of a case, but in this case, and for the reasons stated, no such exception appears.

VI.    *Other Claims*

Defendant's remaining claims—that the trial court abused its discretion when it denied his motion to withdraw from the settlement agreement and erred by failing to advise him about a parole requirement following the completion of his commitment to prison—are barred by the terms of the settlement agreement and, with respect to them, the appeal must be dismissed.

## DISPOSITION

With regard to the claims on appeal that defendant did not enter into his waiver agreement knowingly, intelligently, and voluntarily, and that he received ineffective assistance of counsel, the judgment is affirmed.  With regard to all other claims, the appeal is dismissed.

_____
Márquez, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Bamattre-Manoukian, J.